# IN THE SUPREME COURT OF IOWA

No. 18–0813

Filed January 31, 2020

**IN THE INTEREST OF B.H.A.,**
Minor Child.

**J.R.,** Mother,

    Appellant,

vs.

**M.A.,** Father,

    Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Floyd County, Karen Kaufman Salic, District Associate Judge.

A mother seeks further review of a court of appeals decision affirming the denial of her petition to terminate the parental rights of her child's father under Iowa Code chapter 600A. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Judith O'Donohoe of Elwood, O'Donohoe, Braun & White, LLP, Charles City, for appellant.

Danielle M. DeBower Ellingson of Eggert, Erb, Kuehner & DeBower, P.L.C., Charles City, for appellee.

Ann M. Troge, Charles City, guardian ad litem for minor child.

**CHRISTENSEN, Justice.**

The mother of a three-year-old child petitioned for the termination of the father's parental rights due to abandonment under Iowa Code section 600A.8(3)(*b*) (2017).  In further support of her petition, she alleged the father had been sentenced to approximately ten years in federal court for drug charges without any hope of early release.  Although the juvenile court found the father statutorily abandoned the child prior to incarceration, the mother's petition was denied based upon a determination that termination was not in the child's best interest.  On appeal, the only issue is whether termination is in the child's best interest—there is no dispute that abandonment has been proven.  The court of appeals affirmed the juvenile court's determination that termination is not in the child's best interest.  On further review, we disagree.  Accordingly, we vacate the decision of the court of appeals and reverse the judgment of the juvenile court and remand for entry of an order consistent with this opinion.

### I.  Background Facts.

B.H.A. was born in Charles City.  At the time of trial, he was three years, seven months old.  His parents, J.R. (Mom) and M.A. (Dad), first met when they were eighteen and nineteen years old, respectively.  At the time they began dating, Dad was using marijuana and methamphetamine.  Shortly thereafter, Mom began using methamphetamine with him.  Prior to her pregnancy with B.H.A., Mom achieved sobriety.  Sadly, the same cannot be said about Dad.

After graduating from high school in 2008, Mom obtained her certified nursing assistant (CNA) certificate and worked as a CNA for two-and-a-half years, during which time she developed a prescription drug addiction.  At the end of 2010, Mom voluntarily entered a thirty-day

rehabilitation program at a facility in Mason City. Afterward, she moved in with her grandparents in Ely "to get away from town, the drugs" and worked fulltime at an assisted living facility in Cedar Rapids. A year later, after she pled guilty to public intoxication, Mom voluntarily entered a fifteen-month rehabilitation program in Cresco to address her continued prescription drug dependency. She completed the program in early 2013, moved back to Charles City to live with her parents, and began her current occupation as a respite worker.

Dad is a second-generation substance abuser. Both of his parents and his stepmother used drugs, and he began abusing substances at a young age. Around age fifteen, Dad began to drink alcohol heavily. He admitted to using methamphetamine and marijuana daily as well as experimenting with heroin, prescription medications, and mushrooms. In December 2012, Dad was arrested for delivering drugs. As part of his sentence, he resided at a treatment facility in Mason City from September to December 2013. Dad was bullied and verbally abused as a child and has a history of mental health issues. He began self-mutilating at age thirteen and engaged in dangerous behaviors, such as playing Russian roulette with a loaded gun. Over the years, Dad has been diagnosed with major depressive disorder, mood disorder, generalized anxiety disorder, borderline personality disorder, and attention deficit hyperactivity disorder.

In April 2014, Mom went into premature labor and gave birth to B.H.A. B.H.A.'s prematurity compromised his lungs and breathing, and he was immediately transferred to the neonatal intensive care unit (NICU) at the Mayo Clinic in Rochester, Minnesota. Dad was able to follow him by getting a ride from B.H.A.'s maternal grandparents, and Mom joined them after being discharged from the hospital in Charles City.

B.H.A. was in the NICU for nine weeks. Mom was able to remain with him the entire time and stayed in the Ronald McDonald House. Dad visited on four or five weekends for a number of hours but could not visit more often or always catch a ride with B.H.A.'s maternal grandparents because of his work schedule. He was not allowed to stay at the Ronald McDonald House because of a felony conviction.

B.H.A. was discharged in June 2014 with express instructions that he was not to be exposed to smoke because of breathing issues. Since that time, B.H.A. has been developing age appropriately other than residual breathing issues. Upon discharge, B.H.A. and Mom moved in with her parents in Charles City. Dad was present the first time a home health nurse came to their home but otherwise did not attend any of B.H.A.'s doctor appointments after being discharged from the NICU or inquire how his special medical care was going. Although Dad was aware B.H.A. could not be exposed to smoke, he continued to smoke and often smelled of smoke when he visited B.H.A.

Interactions between Dad and B.H.A. occurred a couple times at the home of B.H.A.'s maternal grandparents or Mom would travel thirty miles to Mason City to make the child available to Dad. Dad's limited visitation to Charles City can be explained, at least in part, by his lack of a valid driver's license. During their visits, Mom would provide most of B.H.A.'s basic care; however, she conceded that Dad was a "pretty good dad" at that point in time.

In December 2014, when B.H.A. was eight months old, Mom ended her relationship with Dad. After the breakup, Dad attempted to have some contact with the child. Initially, Mom would bring B.H.A. over to Dad's apartment in Mason City for a few hours on the weekends. However, those visits stopped after March 2015 when Mom brought B.H.A. for a visit and

she found a stranger in Dad's apartment which reeked of smoke. Dad saw or was able to come visit B.H.A. a couple times between March and June 2015, including for his first birthday in April. The last time Dad saw B.H.A. was in June 2015. At that time, B.H.A. was fourteen months old.

From the time of Mom's pregnancy through October 2015, Dad continued to use and distribute controlled substances. In November 2015, he was arrested by a Charles City police officer for driving while suspended and possible possession of a controlled substance. Although initially released, Dad was incarcerated again on December 1 and has remained incarcerated continuously since that date.

In March 2016, Mom unsuccessfully petitioned to change B.H.A.'s last name based upon abandonment by Dad. *See* Iowa Code § 674.6(1) (2015). Dad did not consent to the name change, and the district court denied Mom's request.

In May 2016, Mom began dating a man named Walker. She offered photographs of B.H.A. enjoying activities with Walker and testified that Walker treats B.H.A. as his own. She also testified that Walker is "sort of acting in a position as a parent to [B.H.A.]." Mom testified B.H.A. identifies Walker as parental figure and will sometimes call him "dad," but B.H.A. usually calls him "Walker." Mom further testified that she and Walker have not discussed Walker adopting B.H.A.

On June 22, 2016, the United States charged Dad with conspiracy to distribute methamphetamine for conduct over a twenty-two-month period, ending on October 21, 2015. He pled guilty, and on December 20, the District Court for the Northern District of Iowa sentenced him to 121 months in prison with credit for time already served. At the time of the termination trial, Dad was at a federal incarceration medical facility in Fort Worth, Texas. He was initially placed in the medical facility because of his

recurring health issues with blood clots. By the time of the trial, those issues had been sufficiently addressed such that he could be moved to another prison—perhaps one closer to Iowa. However, because he had already completed one year of the facility's three-year apprentice program in the electric shop, he would be there for at least two more years. His anticipated release date is sometime between September 2024 and January 2026 at which time B.H.A. would be ten or twelve years old.

Since being incarcerated, Dad has taken parenting classes and enrolled in a program called Angel Tree which helps incarcerated parents get their kids gifts for Christmas. Dad has also signed up for classes to complete an associate's degree in business and works in an electric shop and metal shop to learn new skills. Although he had not completed a substance abuse treatment program before his federal conviction, since incarceration Dad has attended N.A. and A.A. meetings and completed a twelve-hour drug program. At the time of the termination trial, he was progressing through a forty-hour program and then planned to complete a 500-hour program that may take a year off his sentence in exchange for placement in a halfway house. Upon release from imprisonment, Dad will be subject to supervised release for five years. Special conditions of his supervision include participation in and successful completion of "a program of testing and treatment for substance abuse," abstinence from alcohol, and participation in a mental health evaluation or treatment program.

While incarcerated, Dad testified he has tried to maintain contact with B.H.A. He testified that he sent B.H.A. letters on ten occasions between December 2015 and July 2017 as well as birthday cards and drawings. However, Mom testified that she received only four or five written communications from him during that time and that only a couple

included inquiries about B.H.A.  The juvenile court found Mom's testimony more credible on this matter.  We agree with this finding.

Dad has called several times to see how B.H.A. was doing.  Mom estimated that he has called maybe eight times from prison and those calls had all been since she filed a name-change petition in March 2016.  Mom rarely accepted calls from Dad because he would call while she was working, and she did not try to call him back.

Dad's last contact with B.H.A. was June 2015—nearly two years before he was sentenced to a term of 121 months in federal prison for drug charges and nearly three years before trial on Mom's petition for the termination of his parental rights over B.H.A.

We will discuss additional facts as necessary.

## II.  Prior Proceedings.

In February 2017, Mom filed a petition to terminate Dad's parental rights based upon abandonment under Iowa Code section 600A.8(3)(*b*).  The juvenile court found Mom met her burden to prove that Dad abandoned B.H.A. but denied her petition based upon a determination that she did not meet her burden to show that termination would be in B.H.A.'s best interest.  Mom appealed.  We transferred the case to the court of appeals, which affirmed the juvenile court.  We then granted Mom's petition for further review.

## III.  Standard of Review.

Private termination proceedings under chapter 600A are reviewed de novo.  *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998).  "Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses."  *Id.*; *see* Iowa R. App. P. 6.904(3)(*g*).

## IV. Analysis.

In this appeal, we must determine whether the juvenile court erred in concluding termination of Dad's parental rights was not proper under Iowa Code chapter 600A (2017).

**A. Analytical Framework.** The Iowa legislature requires the best interest of the child to "be the *paramount consideration* in interpreting" the private termination of parental rights. Iowa Code § 600A.1 (emphasis added). The parents' interest must also be given due consideration. *Id.* Private termination proceedings under Iowa Code chapter 600A are a two-step process. *See id.* §§ 600A.1, .8. Mom must first prove by clear and convincing evidence the grounds for ordering termination of parental rights. *See id.* § 600A.8. The juvenile court found Dad abandoned B.H.A. by clear and convincing evidence and that "[f]rom a technical aspect, the grounds for termination existed at that time [prior to incarceration] given [Dad's] lack of contact with [B.H.A.]." It is undisputed that the first prong has been satisfied by Dad's abandonment of B.H.A. prior to incarceration. For the second prong, Mom must prove by clear and convincing evidence that termination is in the best interest of B.H.A. *See R.K.B.*, 572 N.W.2d at 602. We believe she has met that burden.

**B. Relevant Factors.** For private termination proceedings, the Iowa legislature defined the concept of "best interest of a child" as the following:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1. This court has also borrowed from the statutory best-interest framework outlined in Iowa Code chapter 232. *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). That framework directs this court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child[.]" Iowa Code § 232.116(2). Of importance is the child's emotional and psychological health, *see id.*, and the closeness of the parent–child bond, *see id.* 232.116(3)(*c*). Finally, this court has said, "It is well-settled law that we cannot deprive a child of permanency after the [petitioner] has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *A.H.B.*, 791 N.W.2d at 691 (alteration in original) (quoting *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010)).

The best-interest-of-the-child framework has backward-looking and forward-looking components:

> Central to a determination of this nature are the best interests of the child. In this connection, we look to the child's long-range as well as immediate interests. Hence we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981) (citation omitted); *see R.K.B.*, 572 N.W.2d at 601 (borrowing backward-looking and forward-looking components from chapter 232 to fill in chapter 600A's analytical framework).

Whether the best interest of a child will be served by the termination of parental rights must be decided on a case-by-case basis. Two years ago, we indicated "caselaw has limited utility" when considering the best-

interest-of-the-child framework. *In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018). The court in *Q.G.* recognized our long-held refusal to adopt a formulaic or rule-bound approach. *Id.* While caselaw demonstrates how chapter 600A factors weigh in the balance of the best-interest determination, we expressly stated that "[e]ach case must be decided on its own facts." *Id.*; *see In re B.L.A.*, 357 N.W.2d 20, 22 (Iowa 1984) (stating matters under chapter 600A are cases in equity).

Even though *Q.G.* considered the parental rights of an incarcerated father, its teaching on the balancing of chapter 600A factors is constrained by exceptional circumstances and should not be relied upon as an endorsement of protecting an incarcerated parent's rights at the expense of a child's best interest. In *Q.G.*, we faced the unique existence of a district court-approved stipulation, which dissolved the mother and father's marriage, divided assets, and established custody and visitation arrangements. *Q.G.*, 911 N.W.2d at 767. Those arrangements depended upon the father's compliance with department of correction treatment programs. *Id.* at 767. We also noted the mother and father agreed, upon the father's prison release, that the district court reserved jurisdiction to consider modification of the custody and visitation arrangements. *Id.* Four days after this stipulation was filed in district court, the mother turned around and filed a termination petition. *Id.* at 768 & n.2. On appeal, the father used this stipulation in an effort to limit the scope of evidence considered in the private termination proceeding under chapter 600A. *Id.* at 769–70, 769 n.3. Despite the father's assertion that the district court lacked authority to consider facts occurring prior to the stipulation, the *Q.G.* court rejected his position and considered the stipulation as a factor in the best-interest-of-the-child determination:

> We also note that shortly before the private termination proceeding was filed, the parties agreed to a stipulation that upon [the father's] release from prison, the district court may consider terms and conditions of visitation between [the father] and the children. Although there have been some changes between the date the stipulation was signed and the filing of the termination petition, *the desirability of allowing the recent stipulated agreement of the parties to play out before the district court is a factor to be considered.*

*Id.* at 773 (emphasis added). We are not presented with this exceptional circumstance here. Moreover, "we have discouraged the retention of jurisdiction to modify divorce decrees without a showing of change of circumstances." *In re Marriage of Schlenker*, 300 N.W.2d 164, 165 (Iowa 1981). Generally, a dissolution court is not justified in issuing its decree piecemeal. *Id.* at 165–66.

For the case at hand, chapter 600A's factors support the juvenile court's finding that Dad did not affirmatively assume the duties arising from the role of being a parent. *See* Iowa Code § 600A.1. This is supported in part by his failure to provide financial support for B.H.A. and choosing instead to support his drug addiction. In fact, Dad was gainfully employed during the entire course of Mom's pregnancy up until a few months prior to his incarceration, earning $1000 per month. After covering his own expenses, Dad admitted his contribution "might not have amounted up to a lot." He estimates a total contribution of approximately $400 during that twenty-two month period.

Mom did not seek a court order requiring Dad to contribute financially; however, whether a court-ordered contribution existed is immaterial. "Our courts have long held that all parents are legally obligated to support their children." *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011); *see Dawson v. Dawson*, 12 Iowa 512, 514 (1861) ("The duty of the parent to maintain his offspring until they attain the age of maturity is a perfect common law duty."). Therefore, Dad's obligation to support B.H.A.

persists until his parental rights are terminated. *See H.S.*, 805 N.W.2d at 745. This is true with or without a support order.

In addressing further chapter 600A factors, it is necessary to restate that "[a parent] cannot use his incarceration as a justification for his lack of a relationship with the child." *In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993) (en banc). "This is especially true when the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with a child." *Id.* We express no doubt that Dad's chosen lifestyle was at the expense of a relationship with B.H.A. as illustrated by his abandonment well before any incarceration. Dad's unilateral decision to prioritize drugs over B.H.A. is the reason he has no healthy parental bond or relationship with the child. And Mom is under no duty to ensure there is a healthy father–son relationship. *See* Iowa Code § 600A.8(3)(*c*) ("In making a determination [that a parent has abandoned the child], the court shall not require a showing of diligent efforts by any person to encourage the parent to perform the acts specified in [this section].").

Aside from speculation that Dad may develop an active relationship with B.H.A. in years to come, the record is virtually devoid of any meaningful evidence that terminating Dad's parental rights would be detrimental to B.H.A. due to any alleged closeness of the relationship. *See A.H.B.*, 791 N.W.2d at 691. To the contrary, the record shows it may be detrimental to deny the termination. For example, after Dad's incarceration, Mom attempted to change B.H.A.'s last name. As the only parent who consistently watched out for B.H.A. and provided for all of his needs, it is reasonable to assume she made this decision in the child's best interest. However, Dad refused. A father who has abandoned his child should not retain the legal ability to thwart a well-intentioned decision by a supportive mother. Moreover, Dad's seven plus remaining years of

incarceration are significant in light of the fact that B.H.A. was only three years old at the time of the termination trial.

Dad also lacks any semblance of a supportive family environment. His parents have not contacted Mom or B.H.A. for years, which is an indicator that any future supportive environment upon release is unlikely. On the other hand, Mom has a robust environment of committed support including her parents, siblings, Walker, and Walker's extended family.

The backward-looking component of the record also demonstrates Dad's complete disinterest in B.H.A.'s life. Dad was not supportive during or after the pregnancy. Dad attended only two prenatal classes and later failed to attend any of B.H.A.'s required checkups following his birth in 2014. Mom's unexpected premature labor at twenty-eight weeks resulted in B.H.A.'s severely underdeveloped lungs. This condition required his immediate transfer to the NICU unit at the Mayo Clinic. B.H.A. remained hospitalized there for nine weeks. Mom remained with B.H.A. the entire time, while Dad only visited three to five times because of his work schedule. Further, Mom testified to her concern of Dad's continued drug use *while* B.H.A. was hospitalized. Dad took little initiative to see B.H.A. after his discharge. It was Mom, not Dad, who facilitated the minimal contact and provided the lion's share of transportation for interactions between Dad and B.H.A. when he lived thirty miles away. The juvenile court found Mom provided most of the care when Dad visited B.H.A.

This inconsistent pattern of visits continued for eight months until Mom ended the relationship. Over the next few months, Mom would bring B.H.A. to Dad's apartment for a few hours on the weekends, but those visits lessened and eventually stopped. Contacts in 2015 were sparse. Dad's limited involvement in B.H.A.'s life continued to decline, and along with it, the quality of each meeting. By way of example, Father's Day 2015

resulted in Dad's late arrival, apparently under the influence of a substance. Mom asked Dad to leave. Less than a month later, Dad overslept for an early afternoon interaction. After refusing to let Dad stop by hours later, Mom testified Dad threatened to kill himself on her steps. On another occasion, Dad threatened to crash into Mom's car and "blow his brains out." Dad's mental health is a factor we consider when it affects his ability to meet the needs of B.H.A. *See In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016) ("We may consider '[w]hether the parent's ability to provide [for] the needs of the child is affected by the parent's mental capacity or mental condition. . . .' " (alterations in original) (quoting Iowa Code § 232.116(2)(*a*))).

June of 2015 was the last face-to-face interaction between Dad and B.H.A., and he has been continuously incarcerated since December of 2015. Mom has raised B.H.A. on her own with negligible support from Dad. Mom testified about her employment as a respite worker since 2013 and that she works to support herself and B.H.A. The juvenile court found her employment provided around $18,000 per year, and her tax returns exhibit steady income from full-time work.

Although Mom is in a relationship with Walker, it is uncertain whether adoption is in B.H.A.'s future. Mom, Walker, and B.H.A. enjoy family activities together, and Walker visits almost every day. In September of 2017, Mom gave birth to B.H.A.'s half-brother, R.J., who is Walker's child. Although Mom and Walker are not married and do not live together, it appears Walker's role as a parental figure to B.H.A. has met, if not exceeded, any role assumed by Dad. B.H.A. has referred to Walker as "dad" and Walker acts as a father figure to B.H.A. We view B.H.A.'s unsolicited term of endearment towards Walker as a healthy indicator of attachment. *See* Shelley A. Riggs, *Is the Approximation Rule in the Child's*

*Best Interest? A Critique from the Perspective of Attachment Theory*, 43 Fam. Ct. Rev. 481, 482 (2005) (reviewing the concept of attachment theory and explaining the "function of the attachment bond between parent and child is protection . . . via the reciprocal motive in parent and child to maintain proximity to one another"). The absence of a stepparent waiting to adopt B.H.A. does not overcome the evidence supporting termination of Dad's parental rights.

**V. Conclusion.**

In summary, Dad spent more time, effort, and money on methamphetamines than on his relationship with B.H.A. As a result, he landed a ten-to-twelve-year sentence in federal prison when B.H.A. was only three years old. It is unfair to say that "father and son must wait several years to renew their normal interactions" when, from the beginning, there were no such interactions. And, it is folly to believe Dad is on a "positive path" while being continuously incarcerated since 2015. Rather than speculate about what the future holds for Dad while at a secure facility where he is under the constant watchful eye of armed correctional officers and video surveillance, it is more accurate to look in the rear-view mirror and make a decision for B.H.A. based on what has already happened in his life.

Accordingly, chapter 600A's best-interest factors weigh in favor of terminating Dad's parental rights. Therefore, we vacate the decision of the court of appeals, reverse the judgment of the juvenile court, and remand for entry of an order consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except Wiggins, C.J., and Appel, J., who dissent.

**WIGGINS, Chief Justice (dissenting).**

I dissent. I agree with the court of appeals judges and the district court judge, who saw the witnesses live, that termination is not in B.H.A.'s best interest.

When interpreting chapter 600A, the child's best interest "shall be the paramount consideration" but the parents' interests "shall be given due consideration." Iowa Code § 600A.1 (2017).

"The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent." *Id.* When determining whether a parent has affirmatively assumed the duties of being a parent, we consider "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.* We also consider aspects from section 232.116(2) and (3), including the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child relationship." *Id.* § 232.116(2)–(3); *accord In re Q.G.*, 911 N.W.2d 761, 771 (Iowa 2018); *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010).

The best-interest analysis is both forward- and backward-looking. *In re Q.G.*, 911 N.W.2d at 771.

> We look to the child's long-range, as well as immediate, interests. We consider what the future holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care the parent is capable of providing. Our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child.

*Id.* (quoting *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998)).

I also note that we have not adopted any sort of formula or bright-line rule regarding the effect of these factors on the analysis in a particular case. *Id.* Thus, prior caselaw "has limited utility," although it can nonetheless illuminate "how these many factors may affect the balance in determining the best interest of the child." *Id.*

Analyzing the facts in this case, there are factors indicating termination is both in and not in B.H.A.'s best interest. Indubitably, M.A. loves and has demonstrated a continued interest in B.H.A. He professes the desire to have a relationship with B.H.A., and the totality of the record supports this. *See id.* at 773. His attempted and completed communications indicate his continued interest.

At the time of the termination hearing, he was incarcerated in a federal medical facility in Fort Worth, Texas. He was initially placed in the medical facility because of his recurring health issues with blood clots. By the time of the hearing those issues had been sufficiently addressed such that he could be moved to another prison—perhaps one closer to Iowa. However, because he had already completed one year of the facility's three-year apprentice program in the electric shop, he would be there for at least two more years. His anticipated release date is sometime between September 2024 and January 2026.

Although he had not completed a substance abuse treatment program before his federal conviction, since his incarceration he has attended Narcotics Anonymous (N.A.) and Alcoholics Anonymous (A.A.) meetings and completed a twelve-hour drug program. At the time of the termination hearing, he was progressing through a forty-hour program and then planned to complete a 500-hour program that can take a year off his sentence in exchange for placement in a halfway house. Upon release

from imprisonment, M.A. will be subject to supervised release for five years. Special conditions of his supervision include participation in and successful completion of "a program of testing and treatment for substance abuse," abstinence from alcohol, and participation in a mental health evaluation or treatment program.

While incarcerated, M.A. has tried to maintain contact with B.H.A. He testified that he sent B.H.A. letters on ten days between December 2015 and July 2017 as well as birthday cards and drawings. But J.R. testified that she received only four or five written communications from M.A. and that only a couple included inquiries about B.H.A. The district court found J.R.'s testimony more credible on this matter. I agree with this finding.

Since being incarcerated, he has called J.R. approximately eight times. Oftentimes when M.A. would call J.R., she did not answer because she was at work. He was not able to leave voicemails. Although it appears that M.A. could do more to reach out to B.H.A., he is not fully at fault for this. His attempted and completed phone calls and written correspondence demonstrate that M.A. has made a genuine effort to maintain some communication with B.H.A.

Before the hearing, he was not aware of any members of his family who still had contact with J.R. or her parents and who could possibly relay information or messages between M.A. and B.H.A. or M.A. and J.R. After learning at the hearing that his aunt Kim continues to be in contact with J.R., J.R.'s parents, and B.H.A., perhaps this can be an alternative avenue of communication.

There is also the fact that a federal prison inmate ordinarily must pay to make phone calls from prison. *See, e.g., Stay in Touch: Phone Calls*, Fed. Bureau of Prisons, https://www.bop.gov/inmates/communications.jsp [https://perma.cc/M5NP-GP3M] (indicating the

inmate ordinarily pays for the calls). The same holds true for sending written communication. *See, e.g.*, Fed. Bureau of Prisons, U.S. Dep't of Justice, OPI: CPD/CPB, No. 5265.14, *Program Statement*, 18–20 (Apr. 5, 2011), https://www.bop.gov/policy/progstat/5265_014.pdf (indicating a federal inmate must ordinarily purchase the stamps used to send nonlegal mail). The record of M.A.'s overall financial situation suggests it may be financially difficult for him to call or write as much as he might like.

Moreover, given B.H.A.'s young age, it is unclear how much he would get out of phone calls and letters. This is further indicated by the lack of explanation and direction B.H.A.'s caretakers have given him regarding M.A.

Before July 2015, B.H.A. recognized M.A. and would smile, hold out his arms, and reach for him when M.A. was around. However, at the time of the hearing, B.H.A. did not recognize M.A. as his father or recognize who M.A. is when shown pictures. This is undoubtedly due primarily to M.A.'s physical absence. And we have said, "[U]navailability of a parent due to incarceration is no excuse for the lack of a meaningful bond." *In re Q.G.*, 911 N.W.2d at 772.

Nevertheless, I do not think the fact that B.H.A. no longer recognizes M.A. weighs entirely against M.A. As the family therapist testified, how B.H.A. perceives M.A. is largely dependent on how J.R. handles and presents information about M.A. to B.H.A. Of course, J.R. has no affirmative duty to ensure B.H.A. recognizes M.A. However, neither J.R., nor her family, has discouraged B.H.A.'s lack of recognition. For example, J.R. testified, albeit inconsistently, that no one would correct B.H.A. when he would call Walker "dad." She also testified that when she received drawings from M.A. for B.H.A., she showed them to B.H.A. but did not give him any explanation about them. Because of B.H.A.'s young age, unless

the child's primary caretakers help him understand the context of the situation, especially his actual familial relationship with those around him and communications from the physically absent parent, it is unlikely any physically absent parent could maintain a bond or place of importance in the child's life.

In a recent case, we did not find that termination under chapter 600A would be in the child's best interest even though there was no meaningful bond between the parent and child and the child had no memory of the parent because of the child's young age. *Id.* at 772, 774. Further, nothing in the record indicates that M.A. and B.H.A. would not be able to develop a meaningful relationship or that attempting to do so carries the potential of significant emotional or mental harm to B.H.A. *Cf. In re A.H.B.*, 791 N.W.2d at 691 (noting that it would take years of therapy to reestablish a relationship between the father and child and that the therapy necessary would be "fraught with the potential for tremendous emotional harm," and finding termination best protected the child's psychological and emotional health). In fact, B.H.A.'s guardian ad litem believed that in years to come with counseling the child and father could develop an "active relationship." The majority discounts this significant possibility as "speculation."

The majority suggests that to deny termination may even be detrimental to B.H.A. because M.A. refused to consent to B.H.A's name change. J.R. testified that she wanted to spare B.H.A. from knowing that his father "was in prison and that he did drugs and all these things that he's done." This argument is shortsighted and is hardly seen as a detriment to B.H.A. First, J.R. has a history of substance abuse herself. Second, J.R. has a criminal history herself, albeit not to the extent of M.A, but nonetheless, a criminal history. Even with a name change, B.H.A will

likely find out who his father is and who his mother was. B.H.A. resides in a community where people know M.A. is B.H.A's father. He may find out from his community or from asking his own questions. By seeking a name change, and subsequent termination, as a means of escaping this conversation, J.R. seeks a short-term solution for a complex question. Termination does not alleviate the questions that may be posed to J.R. one day.

In light of the history of both parents, it may be detrimental to B.H.A. to not be told about his father. Both parents have struggled with substance abuse and today's science recognizes a genetic component to substance abuse. *See* Linda C. Fentiman, *Rethinking Addiction: Drugs, Deterrence, and the Neuroscience Revolution*, 14 U. Pa. J. L. & Soc. Change 233, 245 (2011) ("While scientists have long recognized that alcoholism and other types of substance abuse seem to run in families, today it is clear that the genetic contribution to addiction is highly complex, affecting both an individual's biology and personality—thus one's genes may increase or decrease the risk that one will try drugs, use them frequently, become tolerant of their effects, seek more of them, and relapse." (Footnotes omitted.)). As well-intentioned as J.R. may be, termination does not address these intricate issues and shielding B.H.A. through termination is not in his best interest.

One of the strongest factors supporting termination is the fact that M.A. contributed very little financially during J.R.'s pregnancy and after B.H.A. was born. Indeed, rather than contributing to B.H.A., he used his surplus funds to purchase drugs. He has not contributed anything while he has been incarcerated.

However, J.R.'s financial situation is tight. There may be some opportunity for M.A. to provide some financial support from prison,

especially now that his physical health has improved and he is working in the prison's electric shop. M.A. may also be able to contribute through the program that helps incarcerated parents get their kids holiday presents. Since being incarcerated, he has enrolled in programs designed to help him obtain gainful employment upon release so that he will be able to provide for B.H.A. Additionally, as there has not been any child support order imposed regarding B.H.A., J.R. could seek to have a court issue one requiring M.A. to contribute financially.

It is worth noting that there is no other person ready to take M.A.'s place and adopt and financially provide for B.H.A. As the financial situation stands, it would not be in B.H.A.'s best interest to be cut off from M.A. as a potential source of financial support.

Currently, B.H.A.'s physical needs are being met by J.R. with some help from her parents and government assistance. However, as discussed above, J.R.'s financial situation is tight, which makes uncertain her future ability to provide for B.H.A.'s needs should something unexpected occur.

In May 2016, J.R. began dating a man named Walker. She offered photographs of B.H.A. enjoying activities with Walker and testified that Walker treats B.H.A. as his own. She also testified that Walker is "sort of acting in a position as a parent to [B.H.A.]" However, she offered conflicting testimony of whether B.H.A. calls Walker "dad." And she conceded that she and Walker have not discussed Walker adopting B.H.A.

In September 2017, J.R. gave birth to Walker's son, R.J. She and Walker are not married, do not live together, and have not talked about taking those steps. She has not discussed that with Walker because, she stated, "He's been a bachelor for so long that he just—I don't think he's ready for a commitment yet." Walker is a farmer, contributes about $50 per month, and helps with formula, diapers, and clothing for R.J. There

is no child support agreement between J.R. and Walker regarding R.J., and nothing in the record indicates there is any sort of custody agreement either.

In addition to Walker, J.R. identified her own father and her brothers as male role models for B.H.A. However, one of her brothers moved to Texas in October of 2017. Walker and his parents "seem very kind" to B.H.A., and it is clear that J.R.'s parents are supportive of B.H.A. Although Walker appears to provide B.H.A. some of the emotional support that a father would, nothing in the record indicates that he financially supports B.H.A. or has in the past.

Factually, the record indicates Walker provides only minimal financial support to his biological son R.J. It does not appear that Walker has attended any of B.H.A.'s doctor's appointments. Moreover, there is no indication that he wishes to adopt B.H.A. or fully step into the role of B.H.A.'s parent. *Cf. In re R.K.B.*, 572 N.W.2d at 602 (terminating father's parental rights because, *inter alia*, the mother's husband supports the child and wishes to adopt him); *In re G.A.*, 826 N.W.2d 125, 131 (Iowa Ct. App. 2012) (terminating father's parental rights because, *inter alia*, the child's stepfather provided for all of the child's needs and was willing to adopt the child). *But cf. In re Q.G.*, 911 N.W.2d at 772, 774 (declining to terminate father's rights even though the children's stepfather was willing to provide for the children's needs and to adopt them).

B.H.A. has an emotional support system in the form of J.R.'s parents; J.R.'s two brothers (although one moved to Texas in October 2017); Walker; Walker's parents; and M.A.'s aunt, Kim. However, besides his aunt, none of M.A.'s family has had any contact with B.H.A. or otherwise indicated they would be willing to provide additional support to M.A. or B.H.A. *Cf. id.* 773 (noting that the father had an extended family

that was willing to support him as a parent and his reentry into society after being released from prison, and that the father's parents had a loving relationship with their grandchildren).

I acknowledge that a parent's past conduct can be "indicative of the quality of the future care that parent is capable of providing." *Id.* at 771 (quoting *In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981)). It is clear that before being incarcerated, M.A. did not comprehend how to be a parent. This is, in part, because of how he was raised, but it is also because of a lack of initiative on his part. Unlike J.R., who did a lot of research and participated in birthing classes after learning of the pregnancy, M.A. did not seek out information on pregnancy, births, or parenting.

However, since being incarcerated, he has recognized his deficient understanding and has taken steps to change that. Nothing in the record indicates that he has failed to take all of the opportunities available to him in prison to learn how to be a parent. To his credit, it appears he enrolled in parenting courses as soon as possible after arriving at the facility in Fort Worth.

It is also clear that many of M.A.'s problems before being incarcerated derived from his substance abuse. Since being incarcerated, he has recognized his substance abuse problems, is actively working to address them, and has a plan on how he will continue addressing them. Notably, he already completed a twelve-hour program, he was in the process of completing a forty-hour program at the time of the hearing, and one of his goals is to complete a 500-hour program that has the added benefit of potentially taking a year off of his incarceration term.

It is nevertheless concerning that he has not yet had any significant treatment for his mental health diagnoses. But because the record is

unclear regarding the continued veracity of his mental health diagnoses, the urgency of that treatment may be somewhat tempered.

Another concern is the lack of support system M.A. will have when he is released. *Cf. Dale v. Pearson*, 555 N.W.2d 243, 246 (Iowa Ct. App. 1996) (indicating family support is relevant to determining the best interest of the child in a custody dispute). He testified that his dad, stepmom, brother, and girlfriend are supportive of him, but both his dad and stepmom have their own substance abuse histories. There is little in the record regarding how his brother or girlfriend currently support him. Further, there is nothing indicating the precautions M.A. plans to take upon release to remain clean. But as his anticipated release is not until 2024 at the earliest, there are few concrete plans M.A. could have in place at the present time. *Cf. In re Q.G.*, 911 N.W.2d at 773 (finding incarcerated father's established living and employment arrangements for after his release, scheduled within months of the termination hearing, factored in his favor).

That also applies to M.A.'s living and employment situation upon release. Nonetheless, I find his enrollment in college courses and in the apprenticeship program in the prison's electric shop, with the goal of using those opportunities to generate means of supporting B.H.A. upon his release, to be compelling evidence that M.A. is in the process of formulating such a plan.

Finally, it is important to note that M.A. has taken responsibility for his actions that resulted in his current incarceration. He has also taken some responsibility for his inconsistent contact with B.H.A. Although he deflects some of the blame to J.R., the record suggests that J.R.'s (understandable) frustrations with M.A. and their situation somewhat hindered M.A.'s efforts and resulted in his discouragement. *See id.* (noting

the mother's evasiveness discouraged the father from continuing efforts to contact his children). And even though M.A. expressed his vexations with J.R., he does not appear to have any residual animosity toward her and believes that she is a great mom and that B.H.A. is taken care of and happy with her.

I cannot see this termination as in B.H.A's best interest. M.A. is finally getting off his lifelong addiction to drugs. Addiction is an illness, not a choice. For M.A., addiction has been an ever-present fixture in his life, both for himself and his father and stepmother. At one point in the relationship, J.R. even asked M.A.'s father and stepmother to not supply M.A. with any drugs. M.A. is unlearning a lifetime of behaviors and observations. He is making an effort to build a future by achieving sobriety and obtaining an education and skills in prison that will help him on reentry to society.

Meantime, J.R. continues to make questionable choices. She has a child with a person who has no plans to marry her and who provides minimal financial support to their shared child and no financial support to B.H.A. By seeking termination, she wants to be a single parent. Although, M.A. does not provide support today, his plans appear to put him in a situation where he will be drug free and able to provide support in the future. Finally, there is no one willing to adopt or step up to be a father to this child. If J.R. happens to die prematurely, B.H.A. becomes an orphan. Best interest analysis is both backward- and forward-looking, and I cannot understand how this prospect is in the best interest of B.H.A. The majority appears to be comfortable embracing the "hope" that one day Walker may fully assume the role and responsibility of caring for B.H.A. as a step-parent or adoptive father; however, they are eager to dismiss any prospect of M.A. developing an active and loving relationship with his son

upon release from federal custody. This is even despite the trial court expressing concern for Walker's "rather weak commitment to even his own son."

After considering all of the above, I conclude that J.R. did not show by clear and convincing evidence that terminating M.A.'s parental rights will be in B.H.A.'s best interest. As we explained in *In re Q.G.*, "Families come in all shapes and sizes, and the prospect of [M.A.] having parental rights should not undermine the home that [J.R. (and a possible future stepparent)] have provided [B.H.A.]." *Id.* at 774. Although M.A. is not scheduled for release for approximately five years, B.H.A. will still be young and have time to experience a closer father–son relationship if M.A. continues on his current positive path. Many of M.A.'s parenting fallacies derive from his substance abuse and lack of parenting role models growing up, both of which he is actively addressing. Further, it should be noted that J.R., herself, is proof that, if given help and the opportunity, people who struggle with substance abuse can overcome their addiction and go on to be caring, present, and supportive parents. M.A. was not afforded the same privilege of assistance and rehabilitation, and for that he is penalized. Currently, while in the federal facility, he is being given the opportunity to demonstrate that he can take steps similar to those taken by J.R., finding sobriety and receiving education so that he may one day provide for B.H.A. The opportunity, and his actions, are dismissed.

M.A. is the product of intergenerational neglect due to parental substance abuse and physical abuse. The majority suggests that a strong determining factor in whether someone can be a good parent is if they themselves were the product of "good" parenting. M.A. lacks positive parenting role models. He acknowledges that he never had a dad who showed him how to be a dad. To a degree, we are products of our

environment—the people and behaviors to which we were exposed. There is no doubt M.A. has an uphill battle ahead of him. Responding to the challenge, M.A.'s actions since his incarceration demonstrate that he is doing the work necessary to become a better, more informed parent to overcome what he has learned from his own upbringing. The majority dismisses his efforts and reduces someone who experienced childhood abuse as less capable of overcoming adversity to improve for themselves and their children. This is wrong.

One other thing really bothers me about the majority opinion. A lawyer or judge can read the majority opinion to find that an incarcerated parent should lose his or her parental rights because of their incarceration. I read everything the majority considers in the best interest of B.H.A. as stemming from M.A.'s incarceration.

The unintended consequences of this decision will further break up African-American families in this state. Studies show Iowa is one of the worst states in the country when it comes to racial disparity regarding imprisonment. *See State v. Plain*, 898 N.W.2d 801, 830 (Iowa 2017) (Wiggins, J., specially concurring). In the child welfare system, the trend of overrepresentation continues with African-American children being disproportionately overrepresented in the Iowa child welfare system. *See* Steve Wood & Alicia Summers, *Disproportionality Rates for Children of Color in Foster Care (Fiscal Year 2012)*, Tech. Assistance Bull., (Nat'l Council of Juvenile & Family Ct. Judges, Reno, Nev.), May 2014, at 27 (2014), [hereinafter *Disproportionality Rates*], https://www.ncjfcj.org/wp-content/uploads/2014/06/Disproportionality-Rates-for-Children-of-Color-in-Foster-Care-for-Fiscal-Year-2012.pdf (noting the Racial Disproportionality Index for African-American children in the child welfare

system is 3.4).[1]  This decision to terminate an incarcerated father's rights will likely affect the rights of parents incarcerated who are involved in the child welfare system.  Commenting on the intersection of race, incarceration, and parental rights, Professor Dorothy Roberts wrote that through various policies and practices,

> [T]ougher criminal penalties are locking up growing numbers of Black parents and children.  The children of many incarcerated parents end up in foster care, and under accelerated termination time lines, long jail terms are increasingly seen as a reason to permanently sever parental rights.

Dorothy Roberts, *Shattered Bonds: The Color of Child Welfare* 103–04 (2002).  By using the majority decision to terminate an imprisoned person's parental rights, this decision will cause disproportionate harm to Iowa's African-American community.

For all these reasons, I must dissent.

Appel, J., joins this dissent.

---

[1]"Disproportionality is the level at which groups of children are present in the child welfare system at higher or lower percentages or rates than in the general population.  An index of 1.0 reflects no disproportionality. An index of greater than 1.0 reflects overrepresentation.  An index of less than 1.0 reflects underrepresentation." *Disproportionality Rates* at 1 n.1.